```
          IN THE UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF ARKANSAS
                  FORT SMITH DIVISION


B & C INVESTMENTS OF
ARKANSAS, INC.                                          PLAINTIFF

VS.                         CASE NO. 06-2002

CITY OF FORT SMITH, ARKANSAS                            DEFENDANT
```

### MEMORANDUM OPINION

Plaintiff, B & C Investments of Arkansas, Inc. (hereinafter "B & C"), brings this action against the City of Fort Smith, Arkansas (hereinafter "the City"), pursuant to 42 U.S.C. § 1983 and Article 2 § 22 of the Arkansas Constitution. B & C alleges that the City imposed an assessment on B & C's property for the cost of a road improvement project, which assessment B & C asserts constitutes an unconstitutional taking of its property without just compensation.

The matter is before the Court for decision following a two-day trial to the Court beginning on September 26, 2006, and the submission of post-trial briefs by the parties. (Docs. 16, 17.) The following will constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### BACKGROUND

1.   The City adopted an ordinance known as the New Street Construction Participation Program (hereinafter the "Program") in

February of 1987.  The ordinance is codified at § 22-131 *et seq.* of the Fort Smith Municipal Code.  (Joint Ex. 1.)

2.   The Program applies only to streets or street segments where, prior to the construction in question, no street facility previously existed.  The Program is not mandatory, and a street is subject to the Program only "if the board of directors shall, by resolution adopted at the time of authorization of construction, designate all or a portion of same [street] as an element of the program." § 22-132, Fort Smith Municipal Code. (Joint Ex. 1 at pg. 1236.)

3.   Under the Program, "[a]ll properties physically contiguous to the right-of-way line of new street construction and properties located within three hundred (300) linear feet from the nearest portion of the right-of-way line shall be subject to the participation program . . . ."  § 22-149, Fort Smith Municipal Code.   (Joint Ex. 1 at pg. 1237.)

4.   The Program authorizes the City to charge property owners a pro-rata portion of the cost of new street construction based on a formula factoring in the front footage and depth of the subject property on the newly constructed street.  See § 22-150, Fort Smith Municipal Code.  (Joint Ex. 1 at pg. 1237-38.)

5.  On February 20, 2001, by Resolution R-42-01, the governing body of the City of Fort Smith authorized the construction of the South 79th Street improvements.  (Joint Ex. 3.)

6.   In connection with the construction project, the City filed an application for condemnation of easements on B & C's property.  The City settled the condemnation action by paying B & C $60,000.00.   (Joint Exs. 6 - 9.)   Another affected property owner, Chris Whitt, owner of Zero Business Park, Inc., deeded an easement on his property to the City for the nominal amount of $1.00. (Def. Ex. 14.)  The testimony established that Whitt was in favor of the construction project because he believed that it would enhance the value of his property.   B & C, on the other hand, opposed the project.

7.   By Resolution R-41-01, the governing body of the City of Fort Smith designated a portion of the South 79th Street Project as "new street construction" subject to the Program.   (Joint Ex. 4.)

8.   On March 11, 2001, Resolution R-41-01 was published, designating the properties owned by B & C and Whitt as affected tracts and stating the estimated pro-rata shares of project costs attributable to B & C and Whitt.  (Id.)

9.   The South 79th Street project was completed in September 2001.  In March 2003, B & C was assessed $152,245.89 for its pro-rata share of the costs of construction.   Whitt was assessed $124,461.46 for his share of the costs and he paid the assessment without objection.  (Joint Exs. 11, 13.)

10.  Under the ordinances which authorize the Program, the City may enforce the assessment by requiring that the assessment be

paid as a condition for the issuance of a building permit. However, at the request of B & C, the City adopted Resolution R-248-03, authorizing B & C to begin development of its property by posting a bond to secure payment of the assessment in the event this litigation is unsuccessful. (Def. Ex. 22.) On February 9, 2004, B & C entered into a ten-year ground lease with a developer (Def. Ex. 35) and the developer has commenced construction on the property.

    11.  B & C instituted the present action, asking the Court to declare the New Street Construction Program unconstitutional and to declare the assessment imposed by the City null and void. B & C asserts various arguments in support of its position, which the Court will address in turn.

### DISCUSSION

    12.  <u>Taking Without Just Compensation</u>

    <u>   </u>*  B & C argues that the City, by asserting a special assessment against its land for the purpose of the construction of a new street, violated the Fifth Amendment of the United States Constitution, and the Arkansas Constitution, as both constitutions prohibit a governmental taking of private property for public use, or for a public purpose, without just compensation.

    *  According to established case law, land owners "may be subjected to special assessments to meet the expenses of opening public highways in front of their property . . . such assessments,

according to well-established principles, resting upon the ground that special burdens may be imposed for special or peculiar benefits accruing from public improvements." Norwood v. Baker, 172 U.S. 269, 278 (1898).  However, "the exaction from the owner of private property of the cost of a public improvement <u>in substantial excess</u> of the special benefits accruing to him is, to the extent of such excess, a taking, under the guise of taxation, of private property for public use without compensation."  Id. at 279.[1] (Emphasis added)

*   The City insists the assessment does not amount to a "taking" without just compensation because, in fact, the assessment does not exceed the special benefits accruing to B & C's property. The City introduced evidence at trial indicating that, prior to including the tract in the Program, the City evaluated, through appraisal, the value of the special benefits which would accrue to B & C's property.

*   Specifically, in October 2000, Calvin Moye prepared an appraisal report for the City of Fort Smith to determine the value to be paid to B & C for the easement taken and the enhancement, if any, in the value of the property attributable to the South 79th Street Improvement Project.  Moye noted that prior to the Project,

---

[1] In Norwood, the United States Supreme Court goes further to state "[w]e say 'substantial excess,' because exact equality of taxation is not always attainable; and for that reason the excess of cost over special benefits, unless it be of a material character, ought not to be regarded by a court of equity, when its aid is invoked to restrain the enforcement of a special assessment." Norwood v. Baker, 172 U.S. at 279.

the property was an interior site and that, after completion of the project, the property would be a corner lot with a traffic light at the intersection. Moye compared sales of interior lots versus corner lots from 1997 to 2000 and found a "marked difference in the per-unit value of interior lots and corner site[s]." (Def. Ex. 23 at pg. 3-7.) Moye estimated the value of B & C's property prior to the Project to be $3.50 a square foot and the value of the property after completion of the Project to be $4.25 a square foot, resulting in an enhancement of $113,499.00. (Id. at 3-8.)

   *   In February 2005, Moye prepared a supplemental report expounding upon his prior appraisal. Moye summarized the characteristics of the B & C property before and after the street improvements as follows:

| Before the Public Improvements | After the Public Improvements |
|---|---|
| The subject site was an interior lot with limited and perhaps no public street access at the rear | The subject site is a corner lot with a four-[l]ane access on one frontage and a three lane street access on the other frontage |
| The subject site had limited and perhaps no access to Rogers Ave ... | The subject site has access to Rogers Avenue via a three-lane public curbed and guttered street |
| The subject site did not have the advantage of a stop light at Rogers Avenue, even if access was available | The subject site has the advantage of a stoplight at Rogers Avenue to obtain access to Rogers Avenue |
| The subject site did not have frontage on the west side of the tract, which was longer than the Phoenix Street frontage | The subject site has more than 500 feet of frontage on the west side of the tract on a curbed and guttered 3-lane street |

| | |
|---|---|
| The subject site did not have a stoplight on the Phoenix Avenue frontage | The subject site has a stoplight on Phoenix Avenue slowing traffic for the Phoenix Avenue access and creating access to the west frontage along 79th Street |
| The subject site had frontage only on a limited access street | In addition to the Phoenix Avenue limited access, the subject site has frontage on a street that does not have the limited access peculiar to Phoenix Avenue |

(Def. Ex. 30 at pg. 3.)

   *   Moye explained the effect of the changes to the property as follows:

> Before the public improvement, the site ha[d] approximately 423 feet of frontage along Phoenix Avenue[,] ... a controlled access street. After the project was completed, the subject site has approximately 521 feet of frontage along South 79th Street. The project allow[ed] the subject site to have additional vehicular access drives on 79th that were not available prior to the intersection improvements.
>
> Though more difficult to quantify, a corner location with frontage on two streets (with turn-lanes) and stop lights on the exits to two major streets (Rogers Avenue and Phoenix Avenue), obviously allows more flexibility when planning a use or multiple uses for the site. This flexibility equates to an enhancement of value.
>
> Additionally, ... [t]he extension of 79th Street "brought" Rogers Avenue exposure to the site. It would not have been financially feasible for the ownership of the subject site to build a three-lane street to the rear of their property to gain that access.

(Id. at pg. 2.)

   *   Moye compared sales of interior lots versus corner lots on Phoenix Avenue from 1997 to 2004, and estimated that corner lots

sold for, on average, $1.17 more per square foot.  (Def. Ex. 30 at pg. 4.)  Based on this estimation, the B & C property would have been enhanced in value by $227,208.00 ($1.17 X 194,195 square feet).

 * At trial, Moye identified a study of sales of similar property, including Mr. Whitt's property, in which the "primary corner" was divided off and sold separately for an average of $7.00 a square foot.  According to Moye's studies, B & C's primary corner alone had been increased in value by $192,500.00 by the street improvement project.  (Def. Ex. 37.)  Moye noted that his calculations were supported by the aforementioned lease of the property by B & C to a developer, which lease valued the entire tract of property, not just the primary corner, at $7.00 a square foot.  (Def. Ex. 35.)  Based on the square-footage value set out in the lease, the value of the B & C property had increased by $3.50 a square foot, or $679,683.00.

 * B & C objected that the lease was irrelevant, as it was not a sale of the property and it was entered into "years after the fact."  As pointed out by the City, however, the lease contains an option to purchase and there was testimony that B & C simply "didn't want to sell" at the time it entered into the lease because of "tax reasons."  (Def. Ex. 47 at pgs. 17-18.)  Further, while the lease was not executed until February 2004, proposals for the transaction began in June 2003, shortly after the assessment of

costs to B & C for the street improvement project. (Def. Exs. 31 - 34.)  The Court therefore finds that the lease, while not determinative of the issue, is relevant to show the square footage value of the B & C property.

   *   Moye's appraisal reports and testimony establish that the enhancement in value of B & C's property exceeded the assessment imposed on B & C for the street improvement project.  The Court acknowledges that B & C offered its own appraisal report (Pl. Ex. 4) and the expert testimony of Donald Burris on the enhancement issue.  However, the Court finds Moye's appraisal reports and testimony on the issue to be more credible for the following reasons:

   --   Burris testified that when he was asked to prepare the appraisal, he was "certain" that he would conclude the property had been enhanced in value and that he was "surprised" when the sales data he reviewed revealed no enhancement.  Burris' appraisal, however, included sales data only up to August 2001, and thus, was based on a much more limited time period than Moye's appraisal.  The final assessment of construction costs was not imposed against B & C until March 2003, and the Court finds the sales data used by Moye (dating from 1997 to 2004) to be more comprehensive and relevant.

--   Further, the testimony established that one of the sale values considered by Burris was based on incomplete information.

--   Additionally, there were other sales made within the relevant time period that Burris did not consider.

\*   Based on the foregoing, the Court credits Moye's appraisal reports and testimony and concludes that B & C's taking-without-just-compensation claim fails because B & C's property was enhanced in value beyond the $152,245.89 assessment.

13.   Assessment Based on Formula

B & C next argues that the assessment is unconstitutional because it is based on a front footage and depth formula set out in the municipal code and not on the enhancement in value of the affected property.  The Court sees no merit to this argument.  Case law makes clear that it is not constitutionally fatal for the ordinances authorizing an improvement district, such as the one at issue here, to fail to expressly limit the assessment of cost to the extent of enhancement in value accruing to the affected properties, as this limitation is implied by law.  Stiewel v. Fencing Board of Fencing District No. 6, 70 S.W. 308, 312 (Ark. 1902).

14.   Arbitrary Enforcement of Ordinance

\*   In its post-trial brief, B & C asserts that "this is the only instance in which the New Street Construction Participation

Program has been applied by the City of Fort Smith to its logical fruition - the collection of money or the filing of assessments." (Doc. 16 at pg. 10.) B & C argues that this demonstrates "arbitrariness in enforcement of the Ordinance." (Id. at pg. 11.)

\*   As the City points out, B & C did not plead this legal theory in its complaint, and thus, it need not be considered by the Court. See Bediako v. Stein Mart, Inc., 354 F.3d 835, 841 (8th Cir. 2004). Nevertheless, the Court notes that B & C's argument in this regard is without merit, as the City presented testimony indicating that there were several bases for the application of the Program to the subject project which did not exist with regard to past projects.

    15.   Enforcement of Assessment

\*   Relying on the principles set forth in Dolan v. City of Tigard, 512 U.S. 374 (1994) and Nollan v. California Coastal Comm'n, 483 U.S. 825 (1987), B & C next argues that the "City's requirement for payment of an assessment as a condition for future development constitutes an unconstitutional condition." (Doc. 16 at pg. 14.) The court first points out that B & C has not been prohibited from developing the property. As stated above, B & C was allowed to post a bond to secure payment of the assessment and the lessee of B & C's property has begun development of the property. In any event, the principles set out in Nollan and Dolan have no application to the facts in the present action.

\*   In <u>Nollan</u>, California authorities conditioned the grant of a building permit on the plaintiff's acquiescence in the creation of a public easement across its private beach. The Supreme Court concluded that the imposition by the government of a public easement on plaintiff's property as a condition to the granting of a building permit constituted a taking which necessitated the payment of just compensation.

\*   Similarly, in <u>Dolan</u>, the Supreme Court found unconstitutional a municipal building permit that conditioned development of the property on the landowner's dedication of easements to the city for a bike path and greenway on a portion of the property. The Court concluded that this would constitute a taking requiring compensation.

\*   These principles have no application to the assessment at issue here. As discussed above, the Supreme Court has specifically held that an assessment on private property owners for the costs of a public improvement does not constitute a taking without just compensation where, as here, the assessment does not exceed the special benefits accruing to the private property. <u>See Norwood</u>, 172 U.S. at 278-79. The Court therefore sees no merit to B & C's argument regarding the enforcement of the assessment.

16.   <u>Compliance with State Public Improvement Statutes</u>

Finally, in a single paragraph in its post-trial brief, B & C argues that the assessment did not comply with Arkansas statutes

governing public improvements.  (Doc. 16 at pg. 9.)  This is yet another legal theory not pled by B & C in its complaint.  The Court, therefore, need not address it, and, in any event, having found B & C's federal claims to be without merit, the Court declines to exercise supplemental jurisdiction over this state-law issue.  See 28 U.S.C. § 1367(c).

## CONCLUSION

17.  Based on the foregoing, the Court finds no basis for declaring the New Street Construction Program, or the assessment imposed against B & C thereunder, unconstitutional.  B & C's complaint is therefore subject to **DISMISSAL, WITH PREJUDICE,** in its entirety.

IT IS SO ORDERED this 25th day of January 2007.

/S/JIMM  LARRY  HENDREN
JIMM LARRY HENDREN
UNITED STATES DISTRICT JUDGE